ATTORNEYS FOR APPELLANT

Elizabeth L. Deeley
Kirkland & Ellis LLP
San Francisco, California

Patrick F. Philbin
Kirkland & Ellis LLP
Washington, District of Columbia

D. Randall Brown
Jason T. Clagg
Barnes & Thornburg LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Patrick J. Stueve
Bradley T. Wilders
Stueve Siegel Hanson LLP
Kansas City, Missouri

John J. Schirger
Matthew W. Lytle
Miller Schirger LLC
Kansas City, Missouri

Matthew J. Connelly
Blume Connelly Jordan Stucky & Lauer LLP
Fort Wayne, Indiana

FILED
Jun 02 2015, 10:06 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lincoln National Life Insurance Company, | June 2, 2015 |
| *Appellant-Defendant,* | Court of Appeals Cause No. 02A04-1407-PL-319 |
| v. | |
| Peter S. Bezich, individually and on behalf of a class of others similarly situated, | Interlocutory Appeal from the Allen Circuit Court |
| *Appellee-Plaintiff,* | Honorable Thomas J. Felts, Judge Case No. 02C01-0906-PL-73 |

**Robb, Judge.**

# Case Summary and Issues

[1] Peter Bezich filed a complaint against Lincoln National Life Insurance Company ("Lincoln"), alleging three separate counts of breach of contract regarding his variable life insurance policy. Bezich then moved to certify a class of policyholders on all three breach of contract claims. The trial court issued an order denying class certification as to Count 1 and Count 2 of Bezich's complaint. However, the trial court concluded that a single-issue class may be certified as to Count 3 for the purpose of determining liability. Lincoln appeals, arguing that the trial court erred by certifying a single-issue class for Count 3. Bezich cross-appeals, arguing that the trial court erred by declining to certify a class for Count 1 and Count 2. We conclude the trial court acted within its discretion by certifying a single-issue class for Count 3. However, we conclude that Count 1 and Count 2 should have similarly been certified for class treatment. Therefore, we affirm in part, reverse in part, and remand.

# Facts and Procedural History[1]

[2] Between 1986 and 2008, Lincoln sold a standardized variable life insurance policy known as an Ensemble II. Bezich purchased an Ensemble II in 1996. The Ensemble II works as both a life insurance policy and an investment tool. Amounts paid by the policyholder as premiums are credited to the policy and

---

[1] We held oral argument in this case at the Indiana Statehouse in Indianapolis on April 13, 2015.

are included in the "Accumulation Value" of the policy, which is comprised of premiums, investment earnings, and interest. The actual insurance existing under the policy is called the "Net Amount at Risk," which is the difference between the Accumulation Value and the policy's assigned death benefit.

[3] Lincoln is authorized under the contract to make monthly deductions from the Accumulation Value to keep the policy in force. Those monthly deductions are comprised of two charges: (1) a "cost of insurance" ("COI") charge and (2) an administrative charge.[2] The COI charge is calculated by multiplying the Net Amount at Risk by a COI rate. With respect to that COI rate, the Ensemble II states: "The monthly cost of insurance rate is based on the sex, issue age, policy year, and rating class of the Insured. Monthly cost of insurance rates will be determined by the Company based upon expectations as to future mortality experience." Appellee's Appendix at 19 ("COI rate provision"). Regarding administrative charges, the Ensemble II states the monthly deduction includes "a monthly administrative charge. This charge is equal to $6.00 per month in each policy year." *Id.* ("administrative charge provision").

[4] In 2009, Bezich surrendered his Ensemble II policy and forfeited the $200,000 death benefit the policy provided. On July 25, 2012, Bezich filed his amended

---

[2] Specifically, the Ensemble II states: "Monthly Deduction – The monthly deduction for a policy month shall be equal to (1) plus (2), where: (1) is the cost of insurance . . . [and] (2) is a monthly administrative charge. This charge is equal to $6.00 per month in each policy year." Appellee's App. at 19.

complaint alleging that Lincoln breached three separate provisions of the Ensemble II.

[5] In Count 1, Bezich claims Lincoln breached the terms of the Ensemble II by including non-mortality factors in determining the COI rate charged under the policy. He argues that the terms "based on" and "based upon" in the COI rate provision limit the calculation of the COI rate to consideration of mortality factors only, and because Lincoln imposed COI charges that included expenses undisclosed in the Ensemble II, Lincoln breached the agreement.

[6] In Count 2, Bezich claims Lincoln breached the policy by loading administrative fees and expenses into the COI rate. Bezich argues that the administrative charge provision acts as a cap on administrative expenses, and that the recovery of administrative expenses in excess of $6.00 per month is a breach of the Ensemble II.

[7] In Count 3, Bezich claims Lincoln breached the agreement by failing to reduce the COI rate in response to improving mortality rates. Count 3 relies on contract language saying that "[m]onthly cost of insurance rates will be determined by the Company based upon expectations as to future mortality experience." *Id.*

[8] On August 27, 2012, Lincoln filed a motion to dismiss Bezich's claims, arguing that unambiguous language in the Ensemble II required that Bezich's claims be dismissed as a matter of law. However, the trial court denied Lincoln's motion

as to all three Counts, and in doing so, the court interpreted the relevant provisions corresponding to each Count of Bezich's complaint:

- As to Count 1, the trial court found that the COI rate provision was *ambiguous* insofar as the terms "based on" / "based upon" could lead a reasonable person to believe the COI rate was restricted to mortality factors only, but that the provision could also be read to say that mortality factors were the primary—but not exclusive—factors to be considered in setting rates.
- As to Count 2, the trial court concluded that the administrative charge provision was an *unambiguous* cap on administrative expenses and that "an ordinary policyholder of average intelligence would not interpret this provision to mean that administrative fees can exceed $6.00/month or that these administrative fees can be tacked on to the COI rate." Appellant's Appendix at 43-44.
- As to Count 3, the trial court concluded dismissal was inappropriate because "[g]iving [the COI rate provision] its plain and ordinary meaning, an ordinary policyholder of average intelligence could reasonably interpret this provision to mean that the COI rate would be adjusted based on future mortality expectations, whether those mortality experiences are improving or declining." *Id.* at 44.

[9] On September 16, 2013, pursuant to Indiana Trial Rule 23, Bezich sought to certify a class of Ensemble II policyholders from thirty states on all three Counts. Following an evidentiary hearing, the trial court issued its Findings of

Fact, Conclusions, and Order, denying class certification on Count 1 and Count 2 but granting class certification on Count 3 solely on the issue of liability.

[10] As to Count 1 and Count 2, the trial court concluded that issues concerning extrinsic evidence and choice of law prohibited a finding that common questions of law and fact predominated over questions affecting individual class members. Specifically, the trial court reiterated its finding that the COI rate provision is ambiguous as it applies to Count 1 and thus extrinsic evidence may be necessary to aid the court in interpreting that provision. This would involve an individualized inquiry for each class member to determine whether the policyholders were given information from a salesperson regarding how the COI rate was calculated.[3] After concluding that extrinsic evidence would be important in resolving Count 1 claims, the trial court stated that resolution of Count 2 was "inevitably . . . intertwined" with Count 1 and "[b]ecause Count II will be influenced by extrinsic evidence bearing on the ambiguity in the COI rate provision, there is no way to avoid inquiries into extrinsic evidence for Count I but not Count II." *Id.* at 31.

[11] As to Count 3, the trial court found that because the COI rate provision is unambiguous as it pertains to Count 3, the concern of extrinsic evidence that

---

[3] Lincoln put particular emphasis on an Illustration Questionnaire available to prospective policyholders that explained that the COI rate accounted for expenses and other factors in addition to mortality. Believing the COI rate provision to be ambiguous, the trial court agreed that the Illustration Questionnaire could be used to interpret the Ensemble II in Lincoln's favor.

applied to Count 1 and Count 2 did not apply to Count 3. However, individualized statute of limitations issues prevented the court from finding Count 3 met the predominance and commonality requirements of Trial Rule 23. Nevertheless, the trial court utilized Trial Rule 23(C)(4) to certify a class on Count 3 solely on the issue of liability.

[12] Lincoln now brings this interlocutory appeal, challenging the trial court's certification of a single-issue class on Count 3. Bezich cross-appeals the trial court's denial of class certification on Count 1 and Count 2. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Class Action Requirements

[13] Indiana Trial Rule 23 governs class actions. Subsection (A) sets out four prerequisites that must be met for a party to pursue a class action:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Ind. Trial Rule 23(A). In addition to those prerequisites under subsection (A), the claimant must meet at least one element set out in subsection (B). *See* Ind. Trial Rule 23. Only the third element of subsection (B) is relevant in this case; that element is: "(3) the court finds that the questions of law or fact common to

the members of the class predominate over any questions affecting only individual members . . . ." Ind. Trial Rule 23(B)(3).[4] The requirements of typicality, predominance, and adequacy of representation are of particular importance in this case.

[14] "Typicality may be satisfied through the existence of the same legal theory of the plaintiffs' claims and defenses; typicality may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the class members." *Rose v. Denman*, 676 N.E.2d 777, 783 (Ind. Ct. App. 1997).

[15] As to the predominance requirement under Trial Rule 23(B)(3), there is no precise test for determining whether common questions of law or fact predominate over issues affecting individual members; rather, the court makes a pragmatic assessment of the entire action and all the issues involved. *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 393 (Ind. Ct. App. 2006). Factors that favor a finding of predominance include:

- The substantive elements of class members' claims require the same proof for each class member[.]
- The proposed class is bound together by a mutual interest in resolving common questions more than it is divided by individual interests.
- The resolution of an issue common to the class would significantly advance the litigation.

---

[4] In addition to a requirement that common questions of law and fact predominate, Trial Rule 23(B)(3) also contains a requirement that a class action is "superior" to other methods of adjudication, but Lincoln does not focus on that requirement in this appeal.

- One or more common issues constitute significant parts of each class members' individual cases.
- The common questions are central to all the members' claims.
- The same theory of liability is asserted by or against all class members, and all defendants raise the same basic defenses.

*Associated Med. Networks, Ltd. v. Lewis*, 824 N.E.2d 679, 686 (Ind. 2005) (citation omitted).

# II.  Standard of Review

Whether an action is maintainable as a class action is a question committed to the sound discretion of the trial court. *Associated Med. Networks, Ltd.*, 824 N.E.2d at 682.  Thus, we review the trial court's ruling on a motion for class certification by employing an abuse of discretion standard. *Id.*  The trial court's determination concerning class certification will be affirmed if it is supported by substantial evidence; however, a misinterpretation of law will not justify an affirmance. *Id.*

This case also involves the interpretation of insurance contract provisions.  The interpretation of an insurance contract is a question of law, which we approach using a de novo standard of review. *Justice v. Am. Family Mut. Ins. Co.*, 4 N.E.3d 1171, 1175 (Ind. 2014).  An insurance contract is interpreted "from the perspective of an ordinary policyholder of average intelligence." *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009) (citation omitted).  A contract is ambiguous if "reasonably intelligent people may interpret the policy's language differently . . . ." *Id.*

# III. Count 1[5]

## A. The COI Rate Provision is Unambiguously Limited to Mortality Factors

[18] Bezich argues that the trial court abused its discretion by denying class certification on Count 1 after finding Bezich failed to establish that common questions of law and fact predominate over individualized issues. The grant or denial of class certification hinges on whether the COI rate provision is ambiguous. Whether the contract language is ambiguous is important because Indiana follows the majority "four corners rule," which provides that "extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction." *Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006) (citation omitted).

[19] Bezich contends that the COI rate provision is unambiguous as it relates to Count 1. In its entirety, the COI rate provision says: "The monthly cost of insurance rate is based on the sex, issue age, policy year, and rating class of the Insured. Monthly cost of insurance rates will be determined by the Company

---

[5] As an initial matter, Bezich argues that this court does not have jurisdiction to decide whether the COI rate provision is ambiguous. The trial court first found that the provision was unambiguous in its order denying Lincoln's motion to dismiss. Bezich argues that because this interlocutory appeal concerns only the order on Bezich's motion for class certification—and not the trial court's order denying Lincoln's motion to dismiss—interpretation of the COI rate provision is not properly before this court. Lincoln counters that interpretation of the Ensemble II was clearly at issue in the trial court's order on class certification and that Lincoln was not required to file a separate interlocutory appeal of the trial court's order denying dismissal. In our view, interpretation of the Ensemble II was an integral part of the trial court's order concerning class certification and is a question properly before this court on appeal.

based upon expectations as to future mortality experience." Appellee's App. at 19. Bezich maintains that in the context of a contract like the Ensemble II, the terms "based on" / "based upon" connote exclusivity—i.e. only mortality factors may be considered—and that the contract does not leave room for Lincoln to pad the COI rate with other undisclosed factors or expenses. Lincoln counters that the COI rate provision *unambiguously does not* mean exclusivity, or is, at the very least, ambiguous.

[20] In support of his position, Bezich cites several court decisions concluding COI provisions that stated a rate was "based on" certain factors unambiguously meant that calculation of the rate was limited to the use of those factors. For instance, in *Jeanes v. Allied Life Ins. Co.*, 168 F.Supp.2d 958 (S.D. Iowa 2001), *rev'd on other grounds* 300 F.3d 938 (8th Cir. 2002), the court dealt with an insurance contract which provided in relevant part: "The Cost of Insurance Rate is based on the sex, attained age and rate class of the Insured. . . . Monthly cost of insurance rates will be determined by us based on our expectations as to future mortality experience." *Id.* at 973 (emphasis omitted). The court found that the language was unambiguous and held "the plain language of the contract only allows [the insurance company] to change the cost of insurance for increases in the companies [sic] expectations as to future mortality." *Id.* at 974; s*ee also Alleman v. State Farm Life Ins. Co.*, 334 F. App'x 470, 472 (3d Cir. 2009) (holding that contract language stating "[t]he guaranteed values are *based on* the Insured's age[,] last birthday[,] and sex" unambiguously meant that "age

and sex are the only mortality factors relevant to the rate that the insureds received under the policies.") (emphasis added).

[21] In contrast, Lincoln relies most heavily on *Norem v. Lincoln Benefit Life Co.*, 737 F.3d 1145 (7th Cir. 2013), which dealt with a COI provision similar to the one in this case. The COI rate provision in *Norem* said: "The cost of insurance rate is based on the insured's sex, issue age, policy year, and payment class. The rates will be determined by us, but they will never be more than the guaranteed rates shown on Page 5." *Id.* at 1147. The court held that the provision unambiguously allowed for consideration of non-enumerated factors. *Id.* at 1155. In reaching its holding, the court emphasized dictionary definitions of the term "based on" that suggest a "main ingredient," and the court noted that no dictionary definition of the term meant exclusivity. *Id.* at 1149-50.

[22] Both parties attempt to distinguish the cases cited by their opposition. Lincoln claims that *Jeanes* is inapposite because it held "solely that rate *increases* that had no basis at all in increased mortality were not 'based on' mortality." Appellant's Reply and Cross-Appellee Brief at 37 (emphasis in original). This proposed distinction is unconvincing. Even if that could be viewed as a factual discrepancy between the claim in *Jeanes* and Bezich's Count 1, the court's interpretation of the contract and that interpretation's direct application to this case remains intact.

[23] Bezich argues that *Norem* should be disregarded because there was no contract provision in that case that alluded to "future mortality experience." Indeed, the

court in *Norem* distinguished its decision from divergent federal decisions interpreting COI rate provisions with the term "based on" by pointing out that the COI rate provisions in other cases included references to "mortality experience" while the provision in *Norem* did not. 737 F.3d at 1154 (distinguishing *Yue v. Conseco Life Ins. Co.*, No. CV 08-1506 AHM, 2011 WL 210943 (C.D. Cal. Jan. 19, 2011) and *Jeanes*, 168 F.Supp.2d at 974, both of which held that COI rate provisions unambiguously limited calculation of rates to factors stated in the contract).

[24] Of course, the Ensemble II contains the exact phrase that the court in *Norem* noted was missing from the contract in that case. *See* Appellee's App. at 19 ("Monthly cost of insurance rates will be determined by the Company based upon expectations as to future mortality experience."). We agree with Bezich—and the court in *Norem*—that the presence of that phrase properly distinguishes the Ensemble II from the contract at issue in *Norem*.

[25] Even if *Norem* could not be distinguished on that basis, we would still hold that the Ensemble II unambiguously limits the calculation of the COI rate to mortality factors. Referring to the divergent holdings of cases cited by the parties, the trial court here concluded "it follows that reasonable persons could differ as to the meaning of this phrase." Appellant's App. at 42. However, it is not true in Indiana that a split in court decisions on the meaning of contract terms automatically means that those terms are ambiguous. *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 248 (Ind. 2005). "A disagreement among courts as to the meaning of a particular contractual provision is evidence that an

ambiguity may exist. But a division of authority is only evidence of ambiguity. It does not establish conclusively that a particular clause is ambiguous . . . ." *Id.* (citation omitted) (holding a contractual provision was unambiguous despite a split of authority). Like our supreme court in *Allgood*, we are not inclined to deem an unambiguous contract provision to be an ambiguous one simply because of an inconsistent court decision.

[26] In *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 473-74 (S.D.N.Y. 2014), the court held that a COI rate provision virtually identical to the Ensemble II's was ambiguous solely because of a split in court decisions. We pay particular attention to the decision in *Fleisher* because of Lincoln's reliance on it, which we find puzzling. The court in *Fleisher* was resolute in its belief that "'based on' unambiguously precludes [the insurance company] from considering factors beyond those six factors enumerated in [the contract.]" *Id.* at 473. The court persuasively reasoned that the COI rate provision was unambiguous and that the court in *Norem* had "unnecessarily complicated a simple issue." *Id.* at 470-73. Although the court ultimately held that the existence of competing court decisions rendered the rate provision ambiguous, its analysis only reinforces our belief that the Ensemble II's COI rate provision is unambiguous.

[27] Lincoln compares the Ensemble II to "a cake recipe 'based on' flour, sugar, and eggs" and claims that a person of average intelligence would understand that the recipe was not limited to those three ingredients. Appellant's Reply and Cross-Appellee Brief at 35 (citing *Norem*, 737 F.3d at 1150). But the Ensemble II is not an off-the-cuff cake recipe; it is an insurance contract. Context matters.

The COI rate provision explains how Lincoln calculates the COI rate and thus how the policyholders are charged for holding an Ensemble II policy. An ordinary policyholder of average intelligence would read the COI rate provision to say that the COI rate is calculated using the factors enumerated and only those factors. No reasonable policyholder would read the COI rate provision, which states that the COI rate is "based on the sex, issue age, policy year, and rating class of the Insured . . . [and] based upon expectations as to future mortality experience," and believe that Lincoln implicitly retains the right to charge policyholders a potentially infinite amount of undisclosed fees or costs.

[28] In sum, we hold that the plain language of the COI rate provision unambiguously precludes Lincoln from considering factors other than mortality factors when determining COI rates. Accordingly, there is no need for the trial court to resort to extrinsic evidence, and questions of law or fact common to the members of the class predominate over questions affecting individual members. Therefore, class certification for Count 1 is appropriate.

## B. Need for Extrinsic Evidence Despite a Lack of Ambiguity

[29] Lincoln also contends that even if the COI rate provision is not ambiguous, individualized inquiries involving extrinsic evidence will still be necessary because contract law in a few of the class states requires examination of extrinsic evidence even when reading an unambiguous contract. Lincoln asserts that five of the thirty class states—California, Colorado, Washington, Arizona, and Utah—either permit or require the use of extrinsic evidence even

where a contract is unambiguous on its face. *See* Appellant's Br. at 26; Appellant's Reply Brief at 6. Lincoln claims this variation in law among the class states would require a choice-of-law inquiry for each individual class member and that those inquiries combined with the following need for extrinsic evidence precludes a finding that common issues predominate. Lincoln relies on *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 583-84 (E.D. Mich. 2004), which held that variations in state law regarding the use of extrinsic evidence in interpreting contracts precluded class certification.

[30] The extrinsic evidence that Lincoln contends is relevant to Count 1 (and Count 2) are Illustration Questionnaires and statements potentially made by insurance agents to customers. We note that the Ensemble II provides that "[t]he entire contract consists of this policy and the application (and any supplemental applications for additional Specified Amounts)." Appellee's App. at 11. The contract also states that "[t]he agent has *no authority* to make, modify, alter or discharge any policy." *Id.* at 25 (emphasis added). Thus, the contract clearly embodies the full and final expression of the agreement, and statements made by an agent or written materials outside the Ensemble II, including the Illustration Questionnaire, cannot alter the terms of the policy.

[31] Moreover, the minority-rule states upon which Lincoln relies do not allow consideration of extrinsic evidence if that evidence would vary or alter the language of a contract or if the contract is meant to be the full and final expression of the terms of the agreement. *See, e.g., Taylor v. State Farm Mut. Auto Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993) (citation omitted) ("When two

parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."); *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Ass'n*, 291 P.3d 316, 318 (Cal. 2013) (citing Cal. Civ. Proc. Code § 1856 and Cal. Civ. Code § 1625) (stating "when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing); *Denver Found. v. Wells Fargo Bank, NA*, 163 P.3d 1116, 1126 (Colo. 2007) (en banc) (stating "intent must be determined from contract language itself, and an unambiguous document cannot be explained by extrinsic evidence so as to dispute its plain meaning"); *Daines v. Vincent*, 190 P.3d 1269, 1277-78 (Utah 2008) (stating "there can be no ambiguity where evidence is offered in an attempt to obscure otherwise plain contractual terms"); *Brogan & Anensen LLC v. Lamphiear*, 202 P.3d 960, 961 (Wash. 2009) (en banc) (per curiam) ("The parol evidence rule precludes the use of extrinsic evidence to add to, subtract from, modify, or contradict the terms of a fully integrated written contract; that is, a contract intended as a final expression of the terms of the agreement."). Therefore, the extrinsic evidence that Lincoln relies upon—as it pertains to interpretations of the Ensemble II under Count 1 and Count 2—would not be admissible even under the law of those few minority-rule states. Accordingly,

we conclude that any differences in the use of extrinsic evidence in those states does not prevent class certification on Count 1 or Count 2. [6]

# IV.  Count 2

Bezich argues the trial court erred by ruling that individualized issues of extrinsic evidence and choice-of-law preclude class certification on Count 2. He maintains that the administrative charge provision is unambiguous and that the trial court was wrong to conclude that any ambiguity in the COI rate provision affects the meaning of the administrative charge provision.

In relevant part, the Ensemble II lays out the policyholder's monthly charges as follows:  "Monthly Deduction – The monthly deduction for a policy month shall be equal to (1) plus (2), where:  (1) is the cost of insurance . . . [and] (2) is a monthly administrative charge.  This charge is equal to $6.00 per month in each policy year."  Appellee's App. at 19.  The trial court originally concluded that this provision was an unambiguous cap on administrative fees and that administrative fees in excess of $6.00 could not be tacked onto the COI charge. However, in its order denying class certification on Count 2, the trial court concluded that the resolution of Count 2 was "inevitably intertwined" with

---

[6] Even if the Ensemble II was not an integrated contract and extrinsic evidence would not modify or alter its unambiguous terms, and if extrinsic evidence must be considered by the trial court based on the law followed by a few outlier states, the answer would be to exclude those states from the putative class, not outright denial of class certification.

Count 1 and could be affected by extrinsic evidence that alters the interpretation of the COI rate provision as it pertains to Count 1.

[34] On appeal, Lincoln stands by the trial court's diagnosis that Count 1 and Count 2 are "inevitably intertwined" and that their interrelation prohibits class certification of Count 2. But because we have found that the COI rate provision is unambiguous as it pertains to Count 1, any interrelation with Count 2—if such a connection does exist—does not preclude certification of Count 2. Therefore, we conclude that a class may be certified for Count 2.

# V. Count 3

[35] Finally, we address Lincoln's challenge to the trial court's decision to certify a single-issue class on Count 3. Lincoln challenges the decision based on three of the Trial Rule 23 requirements: (1) adequacy (Rule 23(A)(4)); (2) typicality (Rule 23(A)(3)); and (3) predominance (Rule 23(B)(3)). Because Lincoln's arguments against a finding of predominance and typicality are essentially the same, they are addressed together below.

## C. Typicality & Predominance

### 1. The COI Rate Provision is Unambiguous as it Relates to Count 3

[36] Lincoln presents two arguments that the trial court's findings of predominance and typicality were erroneous with respect to Count 3. Both arguments rely on the proposition that the necessity for extrinsic evidence creates individualized issues that preclude a finding of predominance and typicality. First, Lincoln contends that the COI rate provision is ambiguous as it pertains to Count 3, and

extrinsic evidence is therefore necessary to interpret the provision on a policyholder-by-policyholder basis. Second, Lincoln maintains that even if the COI rate provision is unambiguous as it relates to Count 3, a handful of states included in the proposed class still allow the use of extrinsic evidence to interpret a contract.

[37] Once again, the COI rate provision states: "The monthly cost of insurance rate is based on the sex, issue age, policy year, and rating class of the Insured. Monthly cost of insurance rates will be determined by the Company based upon expectations as to future mortality experience." Appellee's App. at 19. The trial court ruled that the COI rate provision unambiguously provided that "the COI rate would be adjusted based on future mortality expectations, whether those mortality experiences are improving or declining." Appellant's App. at 23. Lincoln contends that the trial court erred by finding the provision unambiguous.

[38] Lincoln chiefly argues that the trial court's decision "cannot be reconciled with [its] holding that the *same language* in the *same provision* of the policy was *ambiguous* in connection with Count I." Appellant's Brief at 29 (emphasis in original). This argument references the trial court's conclusion that the terms "based on" / "based upon" render the provision ambiguous as to whether the COI rate must be calculated *exclusively* using mortality factors. According to Lincoln, it follows that the terms "based on" / "based upon" must also create an ambiguity as to whether Lincoln had a contractual obligation to adjust the COI rate to correlate with changes in future mortality expectations.

[39] We disagree that an ambiguity affecting Count 1 would automatically render the provision ambiguous as it relates to Count 3.[7] However, that is not a question we must delve into. As explained above, the COI rate provision is *unambiguous* as it pertains to Count 1. Therefore, Lincoln's argument that an ambiguity transfers from Count 1 to Count 3 has no force because no such ambiguity exists.

[40] As a second effort, Lincoln asserts that the provision is ambiguous for failing to set out precisely how and when the COI rate would be adjusted to account for changes in future mortality. Lincoln claims there is no way to determine a "threshold level of change in mortality required to trigger an obligation to change COI rates." *Id.* at 33. Lincoln further complains that the Ensemble II does not specify how often it must reevaluate mortality for the purpose of updating COI rates.

[41] Lincoln's questions concerning the method of updating rates do not pose a problem that prevents class certification, which is the only issue on appeal. The COI rate provision says that "rates will be determined by the Company based upon expectations as to future mortality experience." Appellee's App. at 19. This is an unambiguous statement that rates will reflect changes in mortality.

---

[7] The COI rate provision unambiguously obligates Lincoln to adjust rates to reflect improving mortality expectations. We are persuaded by *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 481 (C.D. Cal. 2012), which involved a life insurance rate provision nearly identical to the one in this case. In *Yue*, the court stated "when a number is said to be 'based on' a variable, the phrase 'based on' indicates that the number will change in accordance with changes in that variable." *Id.*

Even if Lincoln is correct that the question of precisely *how* and *when* rates must be changed is up for grabs, it is a question that can certainly be answered on a class-wide basis.

[42] Finally, we cannot help but comment upon the absurdity of Lincoln's own interpretation of the COI rate provision, which is that the Ensemble II *allows Lincoln to unilaterally increase rates* on customers to reflect a change in mortality factors but offers no parallel commitment to decrease rates despite an overwhelming improvement in mortality. We have grave doubts that any policyholder of average intelligence would read the COI rate provision to confer on Lincoln that sort of "heads we win, tails you lose" power.

### 2. *Need for Extrinsic Evidence Despite a Lack of Ambiguity*

[43] Lincoln also contends that even if the COI rate provision unambiguously imposes an obligation to change rates as mortality expectations change, individualized inquiries involving extrinsic evidence will still be necessary because contract law in a few of the class states requires examination of extrinsic evidence even when interpreting an unambiguous contract. As discussed above, Lincoln claims this variation in law among the class states would require a choice-of-law inquiry for each individual class member and that those inquiries combined with the following need for extrinsic evidence precludes a finding that common issues predominate.

[44] Bezich counters that the extrinsic evidence issue is irrelevant as to Count 3 because Lincoln has failed to establish that any extrinsic evidence exists that

could potentially alter the interpretation of the COI rate provision as it applies to Count 3. We agree. The Illustration Questionnaire—the extrinsic evidence Lincoln hangs its hat on—is relevant only to the parties' competing interpretations as they relate to Count 1 or Count 2. Although the Illustration Questionnaire could explain that COI rates may include a loading of expenses, nothing in the questionnaire implies that COI rates would not be adjusted to correspond with changes in mortality expectations. Because the use of extrinsic evidence would not change the outcome under Count 3, class certification should not be denied on that basis.[8] *See Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004) (stating that Indiana's choice-of-law analysis first asks "whether the differences between the laws of the states are important enough to affect the outcome of the litigation.") (citation and internal quotation marks omitted).

## D.    Adequacy

Lincoln also contends that the trial court abused its discretion by finding that Bezich is an adequate representative of the proposed class. The Trial Rule 23(A)(4) adequacy requirement has three components: "1) the chosen class representative cannot have antagonistic or conflicting claims with other members of the class; 2) the named representative must have a sufficient interest in the outcome to ensure vigorous advocacy; and 3) counsel for the named

---

[8] Even if material extrinsic evidence did exist that must be dealt with based on the law followed by minority-rule states, the answer would be to exclude those states from the putative class, not outright denial of class certification.

plaintiff must be competent, experienced, qualified, and generally able to conduct the proposed litigation vigorously." *N. Ind. Pub. Serv. Co. v. Bolka*, 693 N.E.2d 613, 618 (Ind. Ct. App. 1998), *trans. denied*.

[46] We note initially that there seems to be general agreement among the parties that Bezich has a sufficient interest in the outcome to ensure vigorous advocacy, and that Bezich's counsel is qualified to litigate this case. Lincoln's challenges to Bezich's adequacy as a class representative are claims that he poses a risk of conflict with certain members of the proposed class.

[47] First, Lincoln states that uncontradicted evidence presented to the trial court showed that updating COI rates in the manner Bezich advocates would actually result in *higher* COI rates for some of the putative class members.[9] Therefore, Bezich's claim under Count 3 is antagonistic to certain members of the proposed class. Bezich responds that this supposed conflict is entirely speculative, pointing out that he only seeks past damages on behalf of the class and that there would be no order forcing Lincoln to raise rates on policyholders in the future. *See Allen v. Holiday Universal*, 249 F.R.D. 166, 181 (E.D. Pa. 2008) ("[P]otential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not

---

[9] It is unclear what portion of the putative class are allegedly benefitting from Lincoln's refusal to adjust COI rates in response to changes in mortality expectations. The trial court's factual findings (at Paragraph 6) make reference to some "Band 4 policyholders" for whom "Lincoln alleges that at a certain point under the re-pricing, COI rates . . . become lower than expected mortality." Appellant's App. at 22. Those policyholders make up 4.5% of the putative class, and it is possible they are the group Lincoln is using to challenge Bezich's adequacy as a class representative.

bar a finding of adequacy.") (citation omitted).  Additionally, Bezich argues that the possibility of higher COI rates in the future should not be a bar to certification because Lincoln's own interpretation of the Ensemble II would allow it to increase COI rates whenever it pleases.

[48]    The trial court was unconvinced that the sort of speculative harm suggested by Lincoln should preclude a finding that Bezich is an adequate representative.  We are not persuaded that the trial court abused its discretion.  At its essence, Count 3 attempts to establish an interpretation of the Ensemble II that requires Lincoln to adjust COI rates where changes in mortality would benefit the policyholder.  Such an interpretation is beneficial to *all* policyholders, especially when juxtaposed with Lincoln's current interpretation allowing it to increase rates unilaterally to reflect worsening mortality expectations in some policyholders while ignoring improving mortality expectations for other policyholders.

[49]    Second, Lincoln asserts that class members have conflicting interests in selecting the benchmark to be used for updating COI rates.  According to Lincoln, there are several mortality studies from which it could have extracted mortality expectations to adjust COI rates, and some class members would have a lower COI rate under an alternate benchmark than under the benchmark proposed by Bezich.  This, Lincoln argues, presents an intra-class conflict that renders Bezich an inadequate class representative.

Bezich's primary response is that the question of what is the proper benchmark is one that affects damages and should not defeat class certification on the issue of liability. "Courts generally reject the argument that an intra-class conflict exists when divergent theories of liability would benefit different groups within the class. Courts have thus rejected challenges to the class representatives' adequacy that were based . . . on different class members desiring different methods of calculating damages . . . ." Williams B. Rubenstein et al., *Newberg on Class Actions* § 3:62 (5th ed.). We agree that competing options for establishing damages should not preclude class certification. Any conflict as to the method of establishing damages is outweighed by the class members' overall interest in establishing Lincoln's liability class-wide.

In sum, we conclude that the trial court's determination that Bezich is an adequate class representative was not an abuse of discretion.

# Conclusion

Concluding that class certification for the purpose of determining liability is proper for each of Bezich's three breach of contract claims, we affirm the trial court's judgment as to Count 3, reverse as to Count 1 and Count 2, and remand for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

Bailey, J., and Brown, J., concur.